[Civ. No. 12462.   Second Dist., Div. One.—June 3, 1941.]

J. Q. GILCHRIST, Respondent, v. JOHN HARRAH et al., Defendants; WILLIAM HARRAH, Appellant.

Harold B. Pool for Appellant.

J. Q. Gilchrist, *in pro. per.,* for Respondent.

DESMOND, J., *pro tem.*—Here plaintiff, an attorney, obtained a judgment against William Harrah in the sum of $1,000 for professional services rendered. From this judgment the defendant appeals, as well as from the order of the court denying his motion for a new trial. Such an order is not appealable (Code Civ. Proc., sec. 963), and we shall consider therefore the merits of the appeal from the judgment.

It is claimed that the contract of employment under which legal services were rendered by the plaintiff was invalid as against public policy, being predicated on plaintiff's agreement to see certain of the supervisors of Los Angeles County privately and to use his influence to secure postponement of action by the board of supervisors upon a proposed resolution initiating proceedings for acquisition by the county of certain real estate. Appellant was interested, as the owner of bonds secured by this real property. The resolution of intention was scheduled to come before the board of supervisors for action at a public hearing noticed for Tuesday, November 14, 1937. On the preceding Friday, November 10th, John Harrah, father of appellant, was introduced to the respondent; and at this meeting arrangements were made for respondent's employment.

According to the testimony, respondent considered that the advisable course, in view of the imminence of early action upon the resolution of intention, would be to secure a postponement of the public hearing, that on the following Monday, he saw one of the county supervisors at his office in the Hall of Records, and in a conversation with him was told "that the board of supervisors did not intend to take final action on the following day but that it would be continued". Respondent interviewed another supervisor at the latter's office on the following Monday and attended the public meeting of the board next day, at which time he learned that once more the proposed resolution would be continued. In the following week respondent interviewed a third supervisor at his office in the Hall of Records and when the matter came before the board for action on the following day he and many other persons addressed the board concerning the proposed purchase and once again the matter was continued.

Respondent testified that at the meeting of November 10th, John Harrah stated to him that his son, William Harrah, was

owner of the bonds and he wanted the respondent "to go ahead and either stop the sale of the Abbott Kinney property to the county or postpone the same until such time as better arrangements could be made with the people who wanted the bonds". It is claimed by appellant that respondent did in fact accomplish just what he was hired to do, but that he should not be paid for his services because of the rule laid down by Cooley in his treatise on constitutional limitations, at page 163—"While counsel may be properly employed to present the reasons in favor of any public measure to the body authorized to pass upon it, or to any of its committees empowered to collect facts and hear arguments, and parties interested may lawfully contract to pay for this service, yet to secretly approach the members of such a body with a view to influence their action at a time and in a manner that do not allow the presentation of opposite views is improper and unfair to the opposing interest; and a contract to pay for this irregular and improper service would not be enforced by the law."

Appellant relies strongly upon *Colusa County* v. *Welch,* 122 Cal. 428 [55 Pac. 243]; respondent upon *Foltz* v. *Cogswell,* 86 Cal. 542 [25 Pac. 60] (where pertinent language appears at pp. 549, 550). In the Colusa County case the agreement was "to secure by means of personal solicitation and by means of private interviews with members of the legislature of California, and by means of lobbying, the defeat of said Senate bill". In that case all the activity of the attorney was to be performed privately, while in the instant case there was in contemplation of the parties not only the seeking of an injunction, as a last resort, if a continuance were refused, but a public hearing at which the respondent actually appeared. At that hearing both parties for and against the project had an opportunity to present their views and as we have noted, respondent and many other people then addressed the board. After this public hearing the matter was called once more, again continued and, so far as the record shows, was never revived. Neither is there anything in the record to indicate that respondent interviewed any of the supervisors after the public hearing. It may be noted here that during respondent's interview with the three supervisors whom he consulted a secretary was present throughout one conversation and a deputy from the office of

the county counsel at another; that during the various conversations other persons were in and out of the office. Quoting from the transcript: "Mr. Gilchrist further testified that he knew that a so-called 'Davis Group' wanted to have the proposed sale consummated by the Board of Supervisors; that on his first visit to the office of Supervisor Jessup, Tom Davis, one of said group, entered the reception room and said to him, 'I see you are going to cause us some trouble'; that on an occasion when he visited the reception room of Supervisor Ford, another member of said group was present, Phil Davis; that said Phil Davis informed him that he (Phil Davis) was there to see Supervisor Ford relative to said proposed purchase; that so far as he was concerned any of the members of said group could have been present at any of the conversations and that, on the two occasions mentioned, they had knowledge of said conversations."

Appellant does not contend that the supervisors decided to abandon the proposed condemnation by reason of a malign influence exerted upon them by respondent. His objection goes to the character of the contract under which respondent was engaged. That contract he claims was void in that it called for employment by respondent of underhand methods proscribed by Professor Cooley and long recognized by the courts as a ground of invalidity.

It was shown, as we have indicated, that respondent on several occasions interviewed members of the board of supervisors, but looking to the contract nothing appears to indicate that such interviews were to provide opportunities for the exercise of improper influence. While respondent had some acquaintance with two of the supervisors, and thought that he could secure postponement, for at least a short time, we have found no record in the transcript that respondent agreed to see the supervisors secretly and the history of what transpired failed to convince the trial judge that there was in these meetings at the public offices of the supervisors any such secret approach as is denounced by Cooley.

Appellant feels that the contract of employment was improper because it called for the exercise of undue influence on respondent's part in securing a postponement. In this connection John Harrah testified that respondent stated at their first meeting "that he thought he could have influence enough to get them to hold it over for a while, or perhaps that

the sale could be prevented. . . . he mentioned the matter of an injunction, if they would not listen to him on just holding it over, . . . I said that there wasn't any ground for an injunction. Of course, it might be used in some manner to perhaps hold it over a little bit. . . . He was going to call on them (three supervisors) and explain that he represented a bondholder, and that there had been some misrepresentations made by the people who were endeavoring to buy these bonds, and he had just been retained, and he wanted time to investigate the thing, and would like to have them lay it over for 30 days. He said that was the idea of what he was going to ask for. . . . He mentioned those three supervisors that he said he knew, and he was going to call them up and make appointments and go and see them. That is the way he expressed—going to call their offices''. On cross-examination this witness was asked the question, ''Then you did not employ the plaintiff on any representation that he had sufficient influence with the Board of Supervisors to get them to do what you wanted done?'', and answered, ''Arbitrarily, no.'' The next question asked by plaintiff in his own behalf: ''What do you mean by 'arbitrarily, no'?'', brought the answer, ''Well, I mean on any positive representation that he could go and tell the Board of Supervisors to postpone the sale, and on your instructions they would postpone the sale.'' On this point respondent testified that he *"did not tell* John Harrah he was influential with any of the supervisors or that he could accomplish any of the desired results through personal or any other kind of influence; that he did tell John Harrah that he was acquainted with one or two of the supervisors, and that he was sure, when all of the facts had been placed before the supervisors, they would at least postpone the proposed purchase for further investigation and in his (Mr. Gilchrist's) opinion, would refuse to consummate the sale entirely after such investigation. . . . *that there was no conversation* between William Harrah and Mr. Gilchrist *relative to the use of any influence,* and that Mr. Gilchrist stated that he thought he could secure a postponement of the proposed sale and would endeavor to see the supervisors for the purpose of placing all the facts before them; that the matter of securing an injunction or restraining order against the Board of Supervisors was discussed; that *Mr. Gilchrist*

*did not tell him he could secure such postponement by the use of any influence with the board."* (Emphasis supplied.)

The following excerpt from respondent's deposition, taken before the trial, is cited by appellant as contradicting respondent's testimony on the trial: "Q. Did you tell him how you were going to have the sale continued? A. I didn't tell him how, other than that I would get in contact with a sufficient number of supervisors and get the continuance. Q. Didn't tell him how you were going to have it done? A. That was the only thing to do—get in touch with the supervisors. Q. What were your intentions? A. By getting in touch with a sufficient number of supervisors and having it continued. Q. How did you intend to go about it? A. Well, partially from the merits of the whole situation and partially from personal influence. Q. What do you mean, personal influence? A. Well, friendship. Q. How many of them did you know? A. I knew two of them and I knew that I could be introduced to a third one. Q. How did you intend to use this influence and friendship? A. By requesting them to put it over. Q. Any other manner? A. No other manner. That is the only manner I know. Q. What did you tell Mr. Harrah? A. I told Mr. Harrah that I knew a couple of the supervisors and that I thought I could prevail upon them to put the matter over. Q. Was Buron Fitts' name mentioned? A. I don't know whether it was or not. It may have been. Q. What were the words you used? Did you tell Mr. Harrah that you would prevail upon the supervisors or did you say you didn't ask them anything, you told them what to do? A. So far as I recall, I told him I was pretty well satisfied that I thought I could put it over, and if he wanted it killed, I thought I could have it killed. Q. Did you tell him how you were going to have it killed? A. I don't think I did. Q. What means or method did you have in mind? A. The whole matter appeared to be such a steal that on the merits alone I thought I could kill it. Q. Without your friendship? A. No, I thought I would have to use my friendship to get a hearing and present the facts to them. Q. What did you tell Mr. Harrah? A. I told him that I was satisfied I could continue it and if he wanted the sale stopped, I could stop it."

Although it does appear from this excerpt that respondent felt he could secure a postponement partially through his

"personal influence" with certain of the supervisors, he defined the term merely as "friendship" and said that through the use of "friendship" he expected to get a hearing and present the facts to the supervisors. Whether he meant a private or public hearing does not appear, but as we have noted, the record indicates that a public hearing was held which, in connection with the subject of the contract, must have been in contemplation of the parties. In this excerpt there is no statement that respondent told John Harrah that he had or intended to use any personal influence or friendship with any of the supervisors. Those expressions were used by respondent under interrogation as describing what was going on in his own mind, his plan of action, not as repeating what he told the other party to the conversation. It is apparent that the trial judge concluded that there was no actual contradiction, in the deposition, of respondent's testimony on the stand and that he would be justified in rejecting John Harrah's testimony that respondent *told him* "that he thought he could have influence enough to get them to hold it over for a while".

From all the testimony produced at the trial the court found "that the contract of service, as heretofore set forth, wherein plaintiff was employed to act as attorney for the defendant William Harrah, was a valid and enforceable contract and was not null or void or contrary to public policy".

We apprehend that the trial judge was satisfied that the interviews at the supervisors' offices were not secret; that they were directed toward continuance of a matter to be decided on its merits, at a public hearing, where every interested party would have an opportunity to be heard, which hearing was held; that an agreement, which contemplated the obtaining of such a continuance, is not vitiated merely because the attorney, who is engaged at the last minute, depends in some measure upon receiving at the hands of five supervisors, of whom two are friendly to him, a continuance that very likely would have been granted to any reputable attorney representing an interested party; in other words, that there is nothing in such an arrangement which calls for the exercise of undue influence.

█ In conclusion we may say that the courts, before they will relieve a party to a contract of responsibility thereunder, on the claim, presented by such party, that the consideration

was against public policy and therefore void, properly will require convincing proof that facts exist which warrant such action. This is so because if the Cooley rule is enforced it is, indeed, for the public good, but the immediate and incidental beneficiary is one who deserves no special consideration from the court. Having entered into a contract with full knowledge of its provisions, it may be assumed that any invalidity which he thinks he discovers after the work has been performed is brought to public notice not for the public interest but solely for his own advantage. Before a man will be permitted through such action to escape payment of a debt, which he has incurred for services rendered, a compelling reason must appear. The trial judge in this case found no such reason and upon a review of the testimony and cases cited, neither do we.

Judgment affirmed.

Doran, Acting P. J., and White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 30, 1941.